642 A.2d 967

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. SEVEN THOUSAND DOLLARS AND RONALD J. DURDEN, DEFENDANTS–APPELLANTS.

Argued November 9, 1993—Decided June 16, 1994.

224

*Michelle Filippone McGeary* argued the cause for appellants (*Nelson & Fromer,* attorneys).

*Paul J. Feldman,* Assistant Prosecutor, argued the cause for respondent (*John Kaye,* Monmouth County Prosecutor, attorney).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Fred DeVesa,* Acting Attorney General, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

In this forfeiture case we focus on the connection that the State must establish between seized property and suspected future criminal activity to permit forfeiture of the property under *N.J.S.A.* 2C:64–1 to –9. The facts require us to determine if that connection is sufficient when the only evidence linking the seized money to illegal activity consists of drug paraphernalia and the money itself.

I

On May 25, 1988, at about 1:33 p.m., Police Officer Matthew Biebel stopped Ronald Durden for a motor-vehicle violation. As Officer Biebel approached the car, he noticed the passenger, Eric Williams, lean forward in his seat. Officer Biebel went directly to the passenger side and instructed Williams to get out of the vehicle. He then searched Williams and the passenger side of the car for weapons and found $7,000 in cash under the front seat. Four thousand dollars of the money was wrapped in bank bands in two bands containing $1,000 each and one band of $2,000; the remainder of the money was in folded $100 packets wrapped with

rubber bands. The denominations were nineteen $100 bills, sixty-six $50 bills, seventy-eight $20 bills, twenty-three $10 bills, and two $5 bills.

After Durden signed a Consent to Search form, the officer made a further search of the vehicle. In the glove compartment he found an eyeglass holder containing six small glassine bags, commonly used for packaging narcotics, and two beepers. In the trunk the officer found a cellular telephone and an Ohaus triple-beam scale with some white residue on it. The amount of the white residue was so small as to preclude testing. The glassine bags were clean.

Officer Biebel questioned Durden and Williams about the items found in the car. Durden told the officer that he had withdrawn the money from the bank and was on his way to buy a car. Williams said that both the beepers and the cellular phone belonged to him. Both men denied ownership of the plastic bags and the scale. The officer took both men to the police station, where a certified drug dog reacted to the money and the scale. The State seized all items uncovered in the search of the car. Durden was charged with possession of drug paraphernalia under *N.J.S.A.* 2C:36–2, a disorderly persons offense, for which the court later entered a conditional discharge.

The State brought this civil forfeiture proceeding against the $7,000 seized from Durden's car, claiming that the money had been used or was intended to be used to facilitate the commission of a crime. Durden denied any connection between the money and any illegal act, and he demanded its return.

At the forfeiture hearing, Officer Biebel testified that in his opinion the money found was associated with drug activity. On cross-examination, however, he could not recall the denominations of the bills that were in the bank wrappers at the time of the stop. The State also called Investigator Brian Rubino, a street supervisor in the Narcotics Strike Force, to testify as an expert in narcotics investigations. Rubino stated that the items found—the triple-beam scale, the plastic bags, the beepers, and the cellular

phone—were consistent with activity involving trafficking in illegal drugs. Furthermore, Rubino testified that a person involved in trafficking in or selling of narcotics at the street level commonly folds money into $100 packets, sometimes securing the packets with rubber bands to facilitate the counting of the money in his or her pocket. In Rubino's opinion, the $7,000 found in Durden's car was for use in a narcotics operation. On cross-examination Rubino stated that the use of bank wrappers was not consistent with a street-level operation. He also admitted that in his experience with drug investigations, he had never seen such a large amount of money in bank wrappers or rubber bands without drugs also being present.

Durden first sought to prove a legitimate source for the money. Paul Benyola, a real-estate broker, testified that he had given Durden a check for $6,000 on May 23, 1988, two days before Durden was stopped. That check represented the deposit on the sale of a house that Durden had owned. The court also accepted an affidavit from Durden's attorney, explaining that he had represented Durden in the sale of that house and that he had held in his trust account $20,636.58 in proceeds, which he had disbursed to Durden on April 20, May 7, and May 9, 1988.

Durden testified that the $7,000 in the car did not come from and was never intended to be used in connection with narcotics. He explained that on May 25, 1988, he had a large amount of money with him because he was going to buy a car on Route 88 in Lakewood, where a number of automobile dealerships are located. He had looked at a Lincoln at one of those dealerships about two days earlier, but the dealer had refused to accept the realtor's check, preferring cash instead. At the hearing, Durden could not remember the name of the dealership. Between the date he looked at the car and the date of the stop, Durden cashed the realtor's check. He recalled that the bank had given him money in bank wrappers, but he did not remember how much was in wrappers or the denominations of the bills. His passenger, Williams, was with him to drive the "old" car after Durden

purchased a new one. Durden testified that Williams had had the money and the beepers on his lap, and that Williams had put the beepers, which belonged to Williams, in the glove compartment and had put the money under the passenger seat as the officer approached the car.

Approximately a month and a half prior to the stop, Durden had cleared out his house so the real-estate agent could show it to prospective buyers. He and some friends had thrown a number of items, including blankets and clothing, into the trunk of Durden's car, and those items remained there until the day of the stop. Durden did not know that the scale, which was in a case, was in the trunk. He explained that his cousin had been living in the house when he had spruced it up. He also denied seeing any white powder on the scale.

Neither Durden nor Williams was employed at the time of the stop, although Durden was to have started a job the next week and was buying the car for transportation to that job. Prior to the stop, Durden had worked at K–Mart for about a year, and at the time of the forfeiture hearing he had been working as a mechanic at Pep Boys for about two years.

Subsequent to the seizure of his money and prior to the forfeiture hearing, Durden was convicted of possession of cocaine in an unrelated incident. He was sentenced to probation, which required him to submit to drug testing and treatment. That judgment of conviction was admitted into evidence, limited to the issue of Durden's credibility.

The court found that the State had proved by a preponderance of the evidence that the $7,000 seized had been connected with an illegal narcotics operation. Explaining the factors that influenced its decision, the court emphasized the location of the money at the stop and the evidence that the passenger had attempted to hide the money as the officer approached. Although the court did find that the money had probably come legitimately from the house sale, it noted that those proceeds could have been used in future illegal activity. Second, the court did not believe that Durden had

planned to use the $7,000 to buy a car. Although it acknowledged that car dealers may not accept realtors' checks, the court believed that the dealers usually ask for a certified or cashier's check rather than cash. Likewise, it believed that Durden could have avoided carrying such a large amount of money if he had had the check certified. The court also found it "strange" that Durden had failed to carry the money in "an attache case or a bag or a suitcase." Lastly, the court found damaging Durden's inability to recall the name of the dealership from which he had planned to buy the car.

Another factor influencing the court was the presence of drug paraphernalia, as well as the beepers and cellular phone, because Durden could not suggest any legitimate purpose for them. Moreover, the court did not believe that Durden had no knowledge of the glassine bags in the eyeglass case and the triple-beam scale in the trunk. Finally, the court found that Durden's unrelated drug-possession conviction diminished his credibility. Because the court concluded that the money more likely than not was being used illegally in connection with a drug operation, it entered judgment for the State and ordered the $7,000 forfeited under *N.J.S.A.* 2C:64-1 to -9.

Durden appealed, claiming that the trial court's findings were not supported by substantial credible evidence; that no authority for the forfeiture existed because he had not been charged with an indictable offense; and that even if the court did find a connection between the cash and unlawful activity, it should have allocated the money between the purported illegal use and a legitimate use. In an unpublished opinion, the Appellate Division first rejected Durden's claim that the forfeiture was unauthorized. Although the court did note the requirement that to qualify for forfeiture the property must have been connected with unlawful activity constituting an indictable offense, it found that "nothing in the statute provides that the defendant must be *charged* with an indictable offense for the property to be subject to forfeiture." Nonetheless, the Appellate Division reversed the order for forfei-

ture and remanded to the trial court for more specific findings on precisely what indictable offense was implicated, on the causal relationship between the cash and that offense, and on whether the money related to a past or future crime or represented proceeds of the sale of contraband. The Appellate Division also directed the trial court to consider whether allocating the cash between an illegal purpose and a legitimate use was appropriate in light of Durden's explanation for the source of the money.

On remand, the trial court identified the implicated indictable offenses as possession of a controlled dangerous substance, contrary to *N.J.S.A.* 2C:35–5, and intent to distribute a controlled dangerous substance, contrary to *N.J.S.A.* 2C:35–10. It found that the connection between the $7,000 and those offenses was that Durden had intended to use the money to purchase narcotics, and therefore the money related to an offense that had not yet been committed. The court further found that the money did not constitute proceeds from the sale of contraband and that its source was probably a real-estate closing. However, it concluded that Durden had failed to demonstrate that he had intended to use any of the money for a lawful use; therefore it did not allocate the money and it deemed the entire sum forfeited.

Durden appealed again, continuing to argue that the trial court's findings were not supported by substantial evidence, that no authority existed for the forfeiture, and that the court should have allocated the money between unlawful and legitimate uses. In an unpublished opinion, the Appellate Division affirmed the forfeiture order, stating that the trial court's findings of fact were supported by credible evidence and that its legal conclusions were fully sustainable.

We granted Durden's petition for certification, 134 *N.J.* 475 (1993), and now reverse.

## II

A civil forfeiture proceeding is brought not against the owner or possessor of the property but as an *in rem* action against

the property. The theory of forfeiture is "based on the misuse of the property rather than resulting from the commission of an offense by its owner or user." *State v. One 1986 Subaru,* 230 *N.J.Super.* 451, 455, 553 *A.2d* 869 (App.Div.1989), *aff'd in part, rev'd in part,* 120 *N.J.* 310, 576 *A.2d* 859 (1990). Thus, under forfeiture law the property itself is considered the offender.

The New Jersey Code of Criminal Justice authorizes forfeiture of property to the State. See *N.J.S.A.* 2C:64–1 to –9. The Code recognizes a distinction between two kinds of contraband. Prima facie contraband includes controlled dangerous substances; firearms unlawfully possessed, carried, acquired or used; illegally-possessed gambling devices; untaxed cigarettes; and untaxed special fuel. *N.J.S.A.* 2C:64–1a(1). Non-prima facie contraband, also known as derivative contraband, is itself innocent in nature but has been used or is intended to be used in furtherance of an unlawful activity or is the proceeds of illegal activities. *N.J.S.A.* 2C:64–1a(2)–(4). The $7,000 in cash that the State seized from Durden is unquestionably derivative contraband, and the State does not challenge the trial court's finding that the cash was not the proceeds of illegal activity.

Although prima facie contraband is automatically forfeited once seized by the State, subject to certain limitations, see *N.J.S.A.* 2C:64–2, to enforce forfeiture of derivative contraband the State must bring a civil action within ninety days of the seizure against the property sought to be forfeited. *N.J.S.A.* 2C–64–3a. In that action the State must prove by a preponderance of the evidence that the seized property was connected to unlawful activity. The "unlawful activity" must be an indictable crime and cannot be merely a disorderly-persons offense. *State v. One (1) 1979 Chevrolet Camaro Z–28,* 202 *N.J.Super.* 222, 229–30, 494 *A.2d* 816 (App.Div.1985). However, the statute does not require that anyone be convicted of that crime: "The fact that a prosecution involving seized property terminates without a conviction does not preclude forfeiture proceedings against the property pursuant to this chapter." *N.J.S.A.* 2C:64–4; *see State v. One 1988 Honda*

*Prelude,* 252 *N.J.Super.* 312, 315, 599 *A.*2d 932 (App.Div.1991). Moreover, the statute also does not require that anyone actually be charged with the indictable activity. *See One 1988 Honda Prelude, supra,* 252 *N.J.Super.* at 315, 599 *A.*2d 932 (noting that courts permit forfeiture even when State dismisses all criminal charges); *State v. Rose,* 173 *N.J.Super.* 478, 483, 414 *A.*2d 600 (App.Div.1980) (finding that notwithstanding failure to indict defendant, seized money could be detained for forfeiture proceedings); *Property Clerk v. Conca,* 148 *A.D.*2d 301, 538 *N.Y.S.*2d 268, 269 (1989) (concluding that disposition of underlying criminal charge is not dispositive of forfeiture proceedings). The absence of a requirement that a person be charged with a crime before forfeiture is allowed is consistent with the underlying nature of civil forfeiture actions as being directed at the property itself and not at any person. Moreover, requiring that the owner be charged with a crime would discourage the State from downgrading cases to disorderly-persons offenses when a downgrade would be otherwise appropriate, because the downgrade would preclude any forfeiture proceedings regarding the property. Lastly, the statute provides that property is subject to forfeiture if it has been or is intended to be used to further or as an integral part of unlawful activity. *N.J.S.A.* 2C:64–1a(2)–(3). Thus, the unlawful activity can be a past crime or an intended but not-yet-committed offense.

We recognize that the State will have little difficulty in establishing the "unlawful activity" prong of its prima facie case. The true burden of the State's prima facie case is establishing the link between the property and that conduct. ˙

To be subject to forfeiture, the property must be used "in furtherance of," "to facilitate the perpetration of," or as "an integral part of" the illegal act. *N.J.S.A.* 2C:64–1a. We have determined that the words of the statute require a direct causal connection between the use of the property and the crime. *One 1986 Subaru, supra,* 120 *N.J.* at 320, 576 *A.*2d 859. The connection connotes a sense of dependency; a merely casual relationship

will not suffice. The State's burden requires that it prove that the connection is proximate and substantial. We note that our emphasis on the connection between the property and the offense for forfeiture proceedings is consistent with Justice Scalia's approach in *Austin v. United States,* 509 *U.S.* ——, ——, 113 *S.Ct.* 2801, 2812, 125 *L.Ed.*2d 488, 506 (1993) (Scalia J., concurring in part and concurring in the judgment). In *Austin,* he urged that in determining whether an *in rem* forfeiture is excessive under the Eighth Amendment, the Court should focus on the depth of the connection between the crime and the property rather than on the value of the penalty in relation to the offense. *Id.* at ——, 113 *S.Ct.* at 2815, 125 *L.Ed.*2d at 509.

Finding a direct, causal relationship is necessarily a fact-specific determination. In cases in which currency is forfeited as derivative contraband, the connection to illegal activity is often grounded in the money's proximity to prima facie contraband, such as controlled dangerous substances, or admitted past or planned illegal activity. *See, e.g., One (1) 1979 Chevrolet Camaro Z–28, supra,* 202 *N.J.Super.* at 226–27, 232, 494 *A.*2d 816 (determining that State had proved necessary connection between money and drug offense where police found cash in amount of $1,440 wrapped around bag of narcotics and driver of car had records of drug transactions in his wallet; driver offered no explanation for why he had both money and drugs on his person and admitted past trafficking in drugs, but denied that he had been selling on night he had been stopped); *State v. One 1978 Ford Van,* 218 *N.J.Super.* 374, 376–78, 527 *A.*2d 935 (App.Div.1987) (finding connection sufficient where police found almost $15,000 in van in close proximity to over five pounds of marijuana, loaded .38 caliber revolver, pills, plastic bags, and two triple-beam scales; driver testified that he had purchased marijuana shortly before his arrest and had planned to resell it for profit; and although court believed money was not illegal proceeds, court found that driver had planned to use it to purchase more drugs). However, neither drugs nor drug paraphernalia need be present to sustain a forfei-

ture of money. *See, e.g., United States v. $215,300 in U.S. Currency,* 882 *F.*2d 417, 419 (9th Cir.1989) (finding sufficient connection to drug activity where over $215,000 hidden on owner's person when flying from Los Angeles to Miami, ticket issued by known drug-related travel agency, dog reacted to money, and traveler nervous and lied about money), *cert. denied,* 497 *U.S.* 1005, 110 *S.Ct.* 3242, 111 *L.Ed.*2d 752 (1990); *United States v. $319,820 in U.S. Currency,* 620 *F.Supp.* 1474, 1478–79 (N.D.Ga. 1985) (finding connection between money and illegal drug activity sufficient where currency found wrapped in masking tape and rubber bands taped to traveler's midsection, in bag, and in boot of man on flight from Miami to Atlanta where money belonged to Colombian citizen and was to be delivered to unknown person in Seattle). In fact, an unexplained substantial amount of money by itself can be persuasive evidence of drug activity. *United States v. Padilla & $40,787.00 U.S. Currency,* 888 *F.*2d 642, 644 (9th Cir.1989); *United States v. $38,600.00 in U.S. Currency,* 784 *F.*2d 694, 698 (5th Cir.1986); *United States v. $93,685.61 in U.S. Currency,* 730 *F.*2d 571, 572 (9th Cir.), *cert. denied,* 469 *U.S.* 831, 105 *S.Ct.* 119, 83 *L.Ed.*2d 61 (1984). We stress, however, that even where police find drugs or drug paraphernalia at the same time as the seized money, the prosecution will not meet its burden in a forfeiture action if it fails to prove a connection between the money and the contraband. *See United States v. One Hundred and Thirty–Four Thousand, Seven Hundred and Fifty–Two Dollars United States Currency,* 706 *F.Supp.* 1075, 1083 (S.D.N.Y. 1989); *One (1) 1979 Chevrolet Camaro Z–28, supra,* 202 *N.J.Super.* at 231, 494 *A.*2d 816; *Ben Ali v. Towe,* 30 *N.J.Super.* 19, 24, 103 *A.*2d 158 (App.Div.1954).

In *$38,600.00 in U.S. Currency, supra,* 784 *F.*2d at 695, the Fifth Circuit reversed an order for forfeiture because the court found that the government had failed to establish a substantial connection between the seized money and any drug activity. At a border-patrol checkpoint, agents detected an odor of marijuana emanating from a car. *Id.* at 696. The search revealed a travel bag containing a pipe with marijuana residue, a package of

cigarette papers, a small pair of scissors, and a small metal box. *Ibid.* Taped under the back seat, the agents found $38,600 in small bills, wrapped in rubber bands and packaged in manilla envelopes. *Ibid.* Although the court acknowledged that a large amount of money, especially in combination with drug paraphernalia, can be sufficient to establish probable cause necessary for forfeiture, it added that

> [t]here seems little question that this evidence, when considered collectively, gives rise to a strong suspicion, perhaps even probable cause, of *some* illegal activity. It is not quite so apparent, however, that these facts give rise to a reasonable belief, supported by more than mere suspicion, that [the driver] furnished, intended to furnish, or had received the money *in exchange for drugs*.
>
> *Id.* at 698.

In reversing the judgment of forfeiture, the court found persuasive the absence of drugs and of any evidence that the driver had ever been involved with or suspected of conducting narcotics transactions. *Ibid.*

Similarly, in *United States v. Three Thousand Five Hundred Fifty Dollars,* 684 *F.Supp.* 1026 (E.D.Mo.1988), the court denied a request for forfeiture, concluding that the government had failed to prove a substantial connection between the seized money and any narcotics transaction. Following a stop for a speeding violation, the police searched the car and found $3,550, some of it in envelopes and some of it loose, in the console between the car seats. *Id.* at 1028. The driver later produced receipts verifying that the money was payment for odd jobs. *Ibid.* At the forfeiture hearing, an undercover Drug Enforcement Agency officer testified that for several weeks prior to the stop, he had been negotiating selling large quantities of marijuana to the driver, but that they had never achieved agreement on any details regarding the date, time, place, quantity, or cost of the deal. *Id.* at 1029. In denying the forfeiture order, the court emphasized that no drugs had been found in the car, the driver was not prosecuted for a narcotics violation, and no concrete evidence of a planned drug transaction had been uncovered. *Ibid.*

■ Although other decisions serve as guideposts, we must determine on a case-by-case basis whether the State has established by a preponderance of the evidence that the seized property is connected to unlawful activity. Once the State demonstrates that the seized money has a direct causal connection to unlawful activity, the burden shifts to the person challenging the forfeiture, the "owner," to show what portion of the money, if any, the court should ascribe to legitimate uses. *One 1978 Ford Van, supra,* 218 *N.J.Super.* at 381, 527 *A.*2d 935. If the owner presents sufficient credible evidence to allocate the funds between illegal and legal purposes, the court must limit forfeiture to only those funds connected with the illegal activity.

### III

■ Forfeiture statutes are generally disfavored in the law. *State v. 1979 Pontiac Trans Am,* 98 *N.J.* 474, 481, 487 *A.*2d 722 (1985); *One (1) 1979 Chevrolet Camaro Z–28, supra,* 202 *N.J.Super.* at 229, 494 *A.*2d 816; *State v. One (1) Ford Van Econoline,* 154 *N.J.Super.* 326, 331, 381 *A.*2d 387 (App.Div.1977), *certif. denied,* 77 *N.J.* 474, 391 *A.*2d 489 (1978). We have required that courts strictly construe forfeiture statutes against the State and " ' "in a manner as favorable to the person whose property is to be seized as is consistent with the fair principles of interpretation." ' " *1979 Pontiac Trans Am, supra,* 98 *N.J.* at 481 (quoting *One (1) Ford Van Econoline, supra,* 154 *N.J.Super.* at 332, 381 *A.*2d 387 (quoting 37 *C.J.S. Forfeitures* § 4b (1943))); *see One 1986 Subaru, supra,* 120 *N.J.* at 320, 576 *A.*2d 859 (same).

■ *N.J.S.A.* 2C:64–3a provides that forfeiture "may be enforced by a civil action." In civil cases, the standard of proof is a preponderance of evidence. Biunno, *Current N.J.Rules of Evidence,* comment 5 on *Evid.R.* 101(b)1 (1993). Although this Court has not squarely addressed the issue, the Appellate Division has found that such a standard is appropriate in civil forfeiture proceedings. *One 1978 Ford Van, supra,* 218 *N.J.Super.* at 380, 527 *A.*2d 935; *State v. McCoy,* 145 *N.J.Super.* 340, 346, 367 *A.*2d

1176 (1976); *State v. Rodriquez*, 130 *N.J.Super.* 57, 61, 324 *A.*2d 911 (1974), *appeal after remand,* 138 *N.J.Super.* 575, 577–78, 351 *A.*2d 784 (1976), *aff'd o.b.,* 73 *N.J.* 463, 375 *A.*2d 659 (1977).

However, the legal fiction of *in rem* proceedings against the property cannot obscure the fact that forfeiture really sanctions the owner of the property. The United States Supreme Court has recognized the criminal character of forfeiture proceedings despite its adoption of the civil burden of proof, and has impressed on civil forfeiture proceedings certain protections normally associated with criminal trials. *See, e.g., Austin, supra,* 509 *U.S.* at ——, 113 *S.Ct.* at 2812, 125 *L.Ed.*2d at 505–06 (applying Eighth Amendment excessive-fines protection to civil forfeiture actions); *United States v. United States Coin & Currency,* 401 *U.S.* 715, 718, 91 *S.Ct.* 1041, 1043, 28 *L.Ed.*2d 434, 437 (1971) (applying Fifth Amendment self-incrimination clause to civil forfeiture proceedings); *One 1958 Plymouth Sedan v. Pennsylvania,* 380 *U.S.* 693, 696, 85 *S.Ct.* 1246, 1248, 14 *L.Ed.*2d 170, 172 (1965) (holding Fourth Amendment exclusionary rule applicable to forfeiture hearings).

Although courts recognize civil forfeitures as punishment, the burden of proof at the proceedings remains a preponderance of the evidence. That lesser standard results in owners of forfeited property being punished for conduct that the State could not prove beyond a reasonable doubt had occurred or would have occurred. When the crime to which the property is allegedly connected is a crime not yet committed, concerns about the penal aspects of civil forfeiture are heightened because the property owner is punished for a crime that he or she might have later decided not to commit. In this case, the money seized from Durden was allegedly connected to an intended crime, but the State offered no testimony bearing on the imminence of that crime or suggesting an impending deal with a drug supplier or an undercover drug agent. Likewise, the police did not seize the money at the site of an imminent drug transaction or even in a known drug location.

We need not, however, pursue further the issue of the burden of proof applicable to a forfeiture proceeding based on an intended crime. The petition for certification did not raise that issue, nor did the parties brief or argue it. Therefore, we decline to resolve that question. *See Fischer v. Johns–Manville Corp.*, 103 *N.J.* 643, 673, 512 *A.*2d 466 (1986).

## IV

■■■ The question in this case is whether the State proved that the $7,000 from Durden's car was substantially and directly related to an indictable crime. The State alleges that those indictable crimes are possession of and intent to distribute controlled dangerous substances, to be committed sometime in the future. We conclude that the link between the money and those offenses is weak and that the State has failed to establish that more probably than not Durden planned to use the $7,000 to purchase illegal drugs. Accordingly, we determine that the trial court's findings were not supported by adequate substantial and credible evidence. *See Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974).

First, the only concrete evidence that the State produced is the presence in Durden's car of the money itself and of various items of drug paraphernalia, including two beepers, six clean glassine bags, a cellular phone, and a triple-beam scale. The police found no drugs anywhere in the car and the State did not produce any notes or records of drug transactions attributable to Durden. The State could not demonstrate that Durden had been involved in or suspected of illegal drug activity prior to the stop, nor could it show with any specificity a planned drug transaction to be consummated in the future. The record contains no indication of when any drug deal was to take place and why the State believed that Durden would use this specific $7,000 in that deal. Moreover, when questioned at oral argument about why the State did not also seek forfeiture of the car that had carried the money to commit the crime, the State explained that it did not believe that

the police had stopped Durden while he was on the way to buy drugs; the State conceded therefore that it could not have proven the necessary nexus between the car and any illegal activity.

The State did produce an expert to explain that the way the money was folded in packets was consistent with the packaging of proceeds from drug activity. In addition, the police officer testified that the trained drug dog had reacted to the money. However, the $7,000 was unquestionably proceeds from a legal real-estate transaction and not from drug trading; thus the expert testimony and the dog's reaction to the money shed little light on illegitimate uses of the money in the future, which is the basis of the State's complaint. Someone involved in narcotics dealing may well wrap all his or her cash, whether drug proceeds or real-estate proceeds, whether intended for the purchase of drugs or the purchase of a car, in packets of $100 secured by rubber bands; but we think that imputing an illegal purpose to a sum of money requires more than simply a demonstration of the way the money is packaged and carried.

Lastly, we find that Durden offered a credible explanation for why he had the $7,000 with him at the time of the stop. Durden was planning to buy a car. We consider it perfectly plausible that a car dealer would insist on cash rather than accept a third-party check, and that someone without steady employment would deal in cash rather than through some other method. Likewise, failing to carry money in an attache case, although perhaps strange to a lawyer, is not at all uncommon and certainly does not serve to link the cash to a future crime. We note as well that Durden's explanation of his mission was consistent with the time of day that car dealerships would have been open and that he was not travelling in a high-volume drug-dealing area at the time of the stop.

Although the State's evidence raises a suspicion that a crime may have been or would have been committed at some time, it does not show that Durden was going to use the seized $7,000 to finance a drug transaction. *See $38,600.00 in U.S. Currency,*

*supra,* 784 *F.*2d at 698. Because the State has not met its burden to sustain the forfeiture, we need not address the allocation-of-funds issue.

V

The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for entry there of an order vacating the order for forfeiture of the $7,000.

O'HERN, J., dissenting.

I agree with the majority that the absence of a criminal conviction does not preclude civil forfeiture of criminal contraband. *United States v. One Assortment of 89 Firearms,* 465 *U.S.* 354, 104 *S.Ct.* 1099, 79 *L.Ed.*2d 361 (1984) (holding that neither collateral estoppel nor double jeopardy bars civil-forfeiture proceeding against weapons following owner's acquittal on criminal charges of dealing in firearms without license). Although the fairer policy might be to require the property owner's conviction as a predicate to forfeiture (or at least to allow for return of the forfeited property after the owner's acquittal), our law does not now contain such provisions. *See N.J.S.A.* 2C:64-4(b) (stating that "[t]he fact that a prosecution involving seized property terminates without a conviction does not preclude forfeiture proceedings against the property"). The principle that the total absence of criminal prosecution does not preclude forfeiture of criminal contraband follows logically from the policy stated in *N.J.S.A.* 2C:64-4(b). Concerns about innocent owners, which this Court expressed in *State v. 1979 Pontiac Trans Am,* 98 *N.J.* 474, 487 *A.*2d 722 (1985), are now treated in *N.J.S.A.* 2C:64-5(b), which provides in pertinent part that seized property

shall not be subject to forfeiture if the owner of the property establishes by a preponderance of the evidence that the owner was not involved in or aware of the unlawful activity and that the owner had done all that could reasonably be expected to prevent the proscribed use of the property by an agent.

That defense demonstrates legislative awareness of the need to limit the unfair reach of the statute as read literally.

However, our concern here is not with the concept of civil forfeiture itself. Rather, our concern is with the application of the mechanism of civil forfeiture in this case. Although forfeiture statutes must be strictly construed against the government, the plain language of the statutes cannot be avoided. To support a forfeiture, the government need demonstrate only " 'a direct causal relationship between the use of the property and the unlawful activity.' " *State v. One 1986 Subaru,* 120 *N.J.* 310, 320, 576 *A.*2d 859 (1990) (quoting *State v. One 1986 Subaru,* 230 *N.J.Super.* 451, 457, 553 *A.*2d 869 (App.Div.1989)). Thus, in this case, we must review the trial court's factual findings to determine whether those findings establish the requisite relationship between the funds at issue and unlawful drug activity. Accepting this case on the basis that the State need establish its case only by a preponderance of the evidence, *ante* at 240, 642 *A.*2d at 975, the State has more than met its burden of proof in support of the forfeiture.

We sit not as factfinders but as appellate reviewers of a nonjury trial and are bound by the findings of the trial court, so long as those findings are supported by adequate, substantial, and credible evidence. "It has otherwise been stated that 'our appellate function is a limited one: we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice' * * *." *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974) (quoting *Fagliarone v. Township of N. Bergen,* 78 *N.J.Super.* 154, 155, 188 *A.*2d 43 (App.Div.), *certif. denied,* 40 *N.J.* 221, 191 *A.*2d 61 (1963)).

In this case, the trial court carefully considered all the relevant credible evidence. (The trial court found the evidence sufficient to support the conclusion that such a relationship existed both initially and on remand from the Appellate Division.) It found that the cash discovered in Durden's car at the time of his arrest was to be used in connection with an illegal narcotics transaction. Among

the facts in the record on which the trial court relied were the following: (1) the money was in the lap of a passenger at the time the officer arrived on the scene; (2) the passenger tried to hide the money under the seat of the car; (3) the cash was in the form of small-denomination bills (nineteen $100 bills, sixty-six $50 bills, seventy-eight $20 bills, twenty-three $10 bills, and two $5 bills) in multiple stacks, each held together by a band; (4) the passenger tried to hide two beepers in the glove compartment; and (5) an eyeglass case in the glove compartment contained six empty glassine bags, which are often used for packaging drugs. Although the trial court gave credence to the fact that the money might have come from the proceeds of a real-estate transaction, it did not accept the explanation that Durden had intended to buy a car with the cash. It reasoned that even if the seller of the automobile had not wished to take Durden's personal check, Durden could have obtained a certified or cashier's check, thus eliminating the need to carry a large bundle of cash. In addition, the court found relevant the presence of a cellular phone in the 1978 Toyota. For people to use cellular telephones in connection with their businesses is not unusual; here, however, Durden said that the phone belonged to his passenger, who was unemployed. Finally, the court found incredible defendant's story that he did not know the case in his trunk contained a triple-beam scale with white residue on it. According to an investigator who works for the Monmouth County Prosecutor and who testified as an expert witness at the trial, such scales are frequently used in drug trafficking. Those facts constitute sufficient credible evidence for the trial court's conclusion that defendant had intended to purchase drugs with the money.

Although not everyone might reach the same conclusion as the trial court did on the same facts, our function is not to make independent findings of fact but to consider whether the trial court's findings are supported by substantial credible evidence contained in the record. That standard has been met here.

*For affirmance* —Chief Justice WILENTZ, and Justices HANDLER and O'HERN—3.

*For reversal and remandment* —Justices CLIFFORD, POLLOCK, GARIBALDI and STEIN—4.